**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LYNN OXENBERG and
RONALD LEWIS

     *Plaintiffs,*

   v.

ALEX AZAR,

     *Defendant.*

Case No. 2:20-cv-00738-CMR

---

**DECLARATION OF JAMES C. PISTORINO IN SUPPORT
OF PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT**

James C. Pistorino, Esq., being duly sworn, deposes and say as follows:

1.     I am an attorney with the law firm Parrish Law Offices.  I represent the Plaintiffs in the above-captioned action.  I submit this Declaration in further support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Cross-Motion for Summary Judgment.

2.     Attached hereto as Exhibit I are true and correct copies of status reports filed by Defendant Alex Azar in *American Hospital Association v. Azar*, Case No. 14-cv-851 (D.D.C.) (pending) filed on March 23, 2020 and December 21, 2018.

3.     Attached hereto as Exhibit J is a true and correct copy of excerpts from a brief filed on April 21, 2020, in *Lewis v. Azar*, Case No. 18-cv-2929 (D.D.C.) (pending).

4.     Attached hereto as Exhibit K is a true and correct copy of excerpts from M. Bigelow, "A Treatise on the Law of Estoppel or of Incontestable Rights", Chap. 2, § 2 (6th ed. 1913).

5.      Attached hereto as Exhibit L is a true and correct copy of a decision issued by Administrative Law Judge Scott Anderson on May 28, 2019 in *In re: LCD Complaint*; Docket No. C-19-396.

6.      Attached hereto as Exhibit M is a true and correct copy of excerpts from the CMS Financial Report for 2018.

7.      I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated:  May 4, 2020

/s/ *James C. Pistorino*
James C. Pistorino, Esq.
**PARRISH LAW OFFICES**
788 Washington Road
Pittsburgh, PA 15228
(412) 561-6250
james@dparrishlaw.com

*Attorney for Plaintiffs*

- 2 -

# EXHIBIT I

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

AMERICAN HOSPITAL ASSOCIATION, *et al.*,   )
                                           )
          Plaintiffs,                     )
                                           )
      v.                                   )   Civil Action No. 14-cv-00851 (JEB)
                                           )
ALEX. M. AZAR, in his official capacity as )
Secretary of Health and Human Services,    )
                                           )
          Defendant.                      )
_____

### DEFENDANT'S STATUS REPORT

Pursuant to the Court's 2018 Order (ECF No. 89), the Secretary of Health and Human

Services ("HHS") provides this status report to inform the Court that HHS remains on track to

meet the reduction targets set forth in the Court's Order. Attached to this status report are

statistics concerning, *inter alia*, the backlog of appeals at the Office of Medicare Hearings and

Appeals ("OMHA") as of the end of the first quarter of FY 2020. *See* Medicare Appeals

Dashboard, Exhibit 1. By the end of the first quarter of 2020, a total of

268,115 appeals remain pending at OMHA, which is a 37% reduction from the starting number

of appeals identified in the Court's 2018 Order (426,594 appeals).

Dated: March 25, 2020                      Respectfully submitted,

                                          JOSEPH H. HUNT
                                          Assistant Attorney General

                                          JEAN LIN
                                          Special Litigation Counsel
                                          Federal Programs Branch

                                        /s/ Nicholas Cartier
                                          NICHOLAS CARTIER
Of Counsel:                              DC Bar # 495850

ROBERT P. CHARROW
General Counsel
JANICE L. HOFFMAN
Associate General Counsel
SUSAN MAXSON LYONS
Deputy Associate General
Counsel for Litigation
KIRSTEN FRIEDEL RODDY
*Attorneys*
United States Department of Health and
Human Services

Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 616-8351
Facsimile: (202) 616-8460
Nicholas.Cartier@usdoj.gov
*Counsel for Defendant*

2

# Medicare Appeals Dashboard

FY 2020 Q1

Reporting Period:  Through Quarter 1 of FY 2020 (December 31, 2019)

*(Data in Appeals)*

| Level 3 - OMHA | Fiscal Year | | | | | | Most Recent 6 Quarters | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | FY 2020 | FY 2019 | | | | FY 2018 |
| | FY 2020 | FY 2019 | FY 2018 | FY 2017 | FY 2016 | FY 2015 | Qtr.1 | Qtr.4 | Qtr.3 | Qtr.2 | Qtr.1 | Qtr.4 |
| Beginning Workload Balance | 292,517 | 417,198 | 578,683 | 675,530 | 886,418 | 767,422 | 292,517 | 318,254 | 343,658 | 379,831 | 417,198 | 483,401 |
| Receipts | 7,560 | 43,887 | 62,762 | 112,933 | 184,240 | 240,360 | 7,560 | 11,744 | 7,989 | 10,195 | 13,959 | 17,132 |
| *RAC* | *242* | *485* | *774* | *13,782* | *35,527* | *47,929* | *242* | *181* | *97* | *76* | *131* | *113* |
| *non-RAC* | *7,318* | *43,402* | *61,988* | *99,151* | *148,713* | *192,431* | *7,318* | *11,563* | *7,892* | *10,119* | *13,828* | *17,019* |
| Appeals Removed | (31,962) | (168,568) | (224,247) | (209,780) | (395,128) | (121,364) | (31,962) | (37,481) | (33,393) | (46,368) | (51,326) | (83,335) |
| *OMHA Dispositions* | *(28,280)* | *(119,848)* | *(92,113)* | *(82,240)* | *(87,123)* | *(78,881)* | *(28,280)* | *(26,301)* | *(29,570)* | *(31,490)* | *(32,487)* | *(24,146)* |
| *RAC* | *(3,880)* | *(15,708)* | *(24,690)* | *(26,054)* | *(33,511)* | *(15,586)* | *(3,880)* | *(3,707)* | *(4,434)* | *(4,021)* | *(3,546)* | *(5,293)* |
| *non-RAC* | *(24,400)* | *(104,140)* | *(67,423)* | *(56,186)* | *(53,612)* | *(63,295)* | *(24,400)* | *(22,594)* | *(25,136)* | *(27,469)* | *(28,941)* | *(18,853)* |
| *SCF (non-add)* [7] | *(16)* | *(14,021)* | *(57,097)* | *(3,208)* | | | *(16)* | *(129)* | *(4,243)* | *(2,860)* | *(6,789)* | *(4,585)* |
| *Appeals combined for efficiency* | *(3,020)* | *(25,339)* | *(29,248)* | *(10,426)* | *(59,375)* | | *(3,020)* | *(3,796)* | *215* | *(8,065)* | *(13,693)* | *(29,248)* |
| *QIC demo - remands for resolution* | *(656)* | *(14,243)* | *(20,175)* | *(22,505)* | *(2,387)* | | *(656)* | *(4,168)* | *(3,176)* | *(5,888)* | *(1,011)* | *(3,996)* |
| *Serial Claims Initaitive* | *0* | *(3,076)* | *(2,574)* | | | | *0* | *(961)* | *(579)* | *(746)* | *(790)* | *(432)* |
| *Low Volume Appeals* | *(1)* | *(5,784)* | *(20,817)* | | | | *(1)* | *(2,231)* | *(282)* | *(174)* | *(3,097)* | *(20,817)* |
| *Hospital Settlements* | *(5)* | *(278)* | *(2,223)* | *(91,401)* | *(246,243)* | *(42,483)* | *(5)* | *(24)* | *(1)* | *(5)* | *(248)* | *(111)* |
| *Inpatient Rehab Facility Settlment (non-add)* | *(460)* | *(6)* | | | | | *(460)* | *(6)* | | | | |
| Net Pending Receipt Increase / (Decrease) | (24,402) | (124,681) | (161,485) | (96,847) | (210,888) | 118,996 | (24,402) | (25,737) | (25,404) | (36,173) | (37,367) | (66,203) |
| Ending Workload (pending appeals) | 268,115 | 292,517 | 417,198 | 578,683 | 675,530 | 886,418 | 268,115 | 292,517 | 318,254 | 343,658 | 379,831 | 417,198 |

1/ FY20 Qtr.1 includes the majority of appeals received through December 31, 2019.

2/ Receipts and dispositions have been updated due to appeal adjustments such as combinations, deletions, and/or corrections.

3/ Receipts exclude reopened appeals but include appeals involved in CMS Hospital Settlements.

4/ The number of appeals adjudicated each fiscal year reflects receipts from multiple fiscal years.

5/ Dispositions exclude remands.

6/ OMHA Dispositions reflect appeals removed by all types of adjudicators.

7/ Starting in FY19, appeals removed through Settlement Conference Facilitation (SCF) are included in OMHA Dispositions at a 1:1 ratio.  Appeals combined for efficiency have been restated for FY19 due to SCF data adjustments.

8/ FY15 through FY18 reflect changes in methodology to include combined appeals.  Discrepancies between Level 2 and Level 3 RAC receipts are largely attributable to these changes in methodology.

9/ Appeals combined for efficiency result in one disposition for a group of combined appeals.  This line accounts for the remainder of received appeals that were combined into single appeals with disposition counts.

10/ Initiative dispositions not reflected separately within the table are counted in "OMHA Dispositions" (as 1 disposition if multiple appeals were combined), and "Received appeals combined for efficiency" (remainder of groups of appeals combined for efficient disposition).

11/ OMHA combines appeals to improve the efficiency of our ALJs.  This includes a large number of Lincare dismissals.  In FY18 OMHA dismissed 8,382 Lincare appeals.  That number rose to 27,607 Lincare appeals in FY19.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN HOSPITAL ASSOCIATION, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 14-cv-00851 (JEB) |
| ALEX. M. AZAR, in his official capacity as Secretary of Health and Human Services, | ) |
| Defendant. | ) |

**DEFENDANT'S STATUS REPORT**

Pursuant to the Court's November 1, 2018 Order (ECF No. 89), the Secretary of Health

and Human Services ("HHS") provides this status report to inform the Court that HHS remains

on track to meet the reduction targets in the Court's November 1 Order. Attached to this status

report are statistics concerning, *inter alia*, the backlog of appeals at the Office of Medicare

Hearings and Appeals ("OMHA"), updated to reflect data received during the fourth quarter of

FY 2018. *See* Medicare Appeals Dashboard, Exhibit 1. As this attachment reflects, there were

417,198 appeals pending at the end of the fourth quarter, and there were only 774 RAC-related

appeals that reached OMHA during FY 2018.

Dated: December 21, 2018                    Respectfully submitted,

                                            JOSEPH H. HUNT
                                            Assistant Attorney General

                                            JEAN LIN
                                            Acting Deputy Director
                                            Federal Programs Branch

/s/ Nicholas Cartier
NICHOLAS CARTIER
Of Counsel:                          DC Bar # 495850
HEATHER FLICK                        Trial Attorney
Acting General Counsel               U.S. Department of Justice
JANICE L. HOFFMAN                    Civil Division, Federal Programs Branch
Associate General Counsel            1100 L Street, NW
SUSAN MAXSON LYONS                   Washington, DC 20005
Deputy Associate General            Telephone: (202) 616-8351
Counsel for Litigation               Facsimile: (202) 616-8460
KIRSTEN FRIEDEL RODDY                Nicholas.Cartier@usdoj.gov
*Attorneys*                          *Counsel for Defendant*
United States Department of Health and
Human Services

Copy of Medicare Appeals Dashboard FY 2018 Q4 Filing

# Medicare Appeals Dashboard

### Reporting Period:  Through Quarter 4 FY 2018
*(Data in Appeals)*

| | Fiscal Year | | | | | | | Most Recent 6 Quarters | | | | | |
| | | | | | | | | FY 2018 | | | | FY 2017 | |
| Level 3  - OMHA | FY 2018 | FY 2017 | FY 2016 | FY 2015 | FY 2014 | FY 2013 | FY 2012 | Qtr 4 | Qtr 3 | Qtr 2 | Qtr 1 | Qtr 4 | Qtr 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Workload Balance | 578,683 | 675,530 | 886,418 | 767,422 | 380,696 | 75,922 | 20,382 | 483,401 | 494,490 | 518,475 | 578,683 | 604,370 | 657,728 |
| Receipts | 62,762 | 112,933 | 184,240 | 240,360 | 474,063 | 384,151 | 117,068 | 17,132 | 17,752 | 10,985 | 16,893 | 26,213 | 27,186 |
| *RAC* | *774* | *13,782* | *35,527* | *47,929* | *239,383* | *193,159* | *30,331* | *113* | *150* | *127* | *384* | *1,360* | *2,097* |
| *non-RAC* | *61,988* | *99,151* | *148,713* | *192,431* | *234,680* | *190,992* | *86,737* | *17,019* | *17,602* | *10,858* | *16,509* | *24,853* | *25,089* |
| Appeals Removed | (224,247) | (209,780) | (395,128) | (121,364) | (87,337) | (79,377) | (61,528) | (83,335) | (28,841) | (34,970) | (77,101) | (51,900) | (80,544) |
| *OMHA Dispositions* | *(92,113)* | *(82,240)* | *(83,765)* | *(78,390)* | *(87,337)* | *(79,377)* | *(61,528)* | *(24,146)* | *(24,278)* | *(23,349)* | *(20,344)* | *(20,793)* | *(20,579)* |
| *RAC* | *(24,690)* | *(26,054)* | *(31,042)* | *(15,225)* | *(28,104)* | *(17,739)* | *(12,357)* | *(5,293)* | *(5,895)* | *(6,880)* | *(6,622)* | *(6,453)* | *(4,622)* |
| *non-RAC* | *(67,423)* | *(56,186)* | *(52,723)* | *(63,165)* | *(59,233)* | *(61,638)* | *(49,171)* | *(18,853)* | *(18,383)* | *(16,469)* | *(13,722)* | *(14,340)* | *(15,957)* |
| *Appeals combined for efficiency* | *(37,743)* | *(10,426)* | *(56,821)* | *(3,220)* | | | | *(37,743)* | | | | *(10,426)* | |
| *Settlement conference facilitation - incl. States* | *(57,097)* | *(3,208)* | *(5,912)* | *(2,192)* | | | | *(4,585)* | *(1,083)* | *(5,200)* | *(46,229)* | *(884)* | *(2,324)* |
| *QIC demo - remands for resolution* | *(20,175)* | *(22,505)* | *(2,387)* | | | | | *(3,996)* | *(2,623)* | *(3,082)* | *(10,474)* | *(5,622)* | *(3,497)* |
| *Serial Claims Initiative* | *(2,574)* | | | | | | | *(432)* | *(510)* | *(1,578)* | *(54)* | | |
| *Low Volume Appeals* | *(12,322)* | | | | | | | *(12,322)* | | | | | |
| *CMS Hospital Settlements* | *(2,223)* | *(91,401)* | *(246,243)* | *(37,562)* | | | | *(111)* | *(347)* | *(1,763)* | *0* | *(14,175)* | *(54,144)* |
| Net Pending Receipt Increase / (Decrease) | (161,485) | (96,847) | (210,888) | 118,996 | 386,726 | 304,774 | 55,540 | (66,203) | (11,089) | (23,985) | (60,208) | (25,687) | (53,358) |
| Ending Workload (pending appeals) | 417,198 | 578,683 | 675,530 | 886,418 | 767,422 | 380,696 | 75,922 | 417,198 | 483,401 | 494,490 | 518,475 | 578,683 | 604,370 |

1/ Receipts exclude reopened appeals but include appeals involved in CMS Hospital Settlements.

2/ The number of appeals adjudicated each fiscal year reflects receipts from multiple fiscal years.

3/ Dispositions exclude remands.

4/ OMHA Dispositions reflect appeals removed by all types of adjudicators, and by all initiatives except those listed in the table above.

5/ Some FY14 dispositions are attributable to Scooter Store dismissals.

6/ FY14 through FY18 reflect changes in methodology to include combined appeals.

7/ FY18 Qtr 4 includes the majority of appeals received through September 30, 2018.

8/ Receipts and dispositions have been updated due to appeal adjustments such as combinations, deletions, and/or corrections.

9/ Appeals combined for efficiency result in one disposition for a group of combined appeals.  This line accounts for the remainder of received appeals that were combined into single appeals within disposition counts.

10/ Initiative dispositions not reflected separately within the table are counted in "OMHA Dispositions" (as 1 disposition if multiple appeals were combined), and "Received appeals combined for efficiency" (remainder of groups of appeals combined for efficient disposition).

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CAROL A. LEWIS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 18-cv-2929 (RBW) |
| ALEX M. AZAR II, in his official | ) | |
| capacity as Secretary of Health and | ) | |
| Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION**

*Third*, and finally, the Secretary turns to Rule 23.  Plaintiffs must "affirmatively demonstrate" their compliance with that rule to merit class certification.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  They have not done so here, principally because a class of twelve does not satisfy the numerosity requirement of Rule 23(a)(1).  For that reason, and others discussed below, class certification should be denied.

## I.   Neither plaintiff should be permitted to litigate this case on the merits.

The Court can resolve this case without addressing plaintiffs' motion for class certification, and it should do so.  The Court has jurisdiction over the claim presented by Ms. Lewis, but the only issue that she raises is *res judicata* in her favor.  Although Ms. Lewis would prefer to evade the preclusive effect of her judgment in the District of Massachusetts, and litigate this case a second time, the Court has the clear authority to address issue preclusion *sua sponte*. The Court need not entertain repetitious litigation on the merits when an earlier judgment establishes a clear entitlement to relief here.  And as the Secretary has explained in his pending motion to dismiss, the Court lacks subject matter jurisdiction over the two claims presented by Mr. Sargent, because both fall short of the Medicare Act's jurisdictional amount in controversy.

### A.   Carol Lewis has won a judgment on this issue; she is therefore entitled to preclusion and payment of her claim, but not to fully litigate a second case.

Ms. Lewis has already litigated to final judgment against the Secretary the issue of whether her continuous glucose monitor is durable medical equipment under the Medicare statute and regulations.  She won.  *Lewis v. Azar*, 308 F. Supp. 3d 574, 579 (D. Mass. 2018).  But now she would avoid the judgment in her favor and persuade this Court to repeat the exercise. "Once a party has fought out a matter in litigation with the other party, [s]he cannot later renew that duel."  *Comm'r v. Sunnen*, 333 U.S. 591, 598 (1948).  Ms. Lewis is entitled to the preclusive effect of her earlier victory; she has no right to pretend that it never happened.  This Court should

enter judgment in her favor on the grounds of *res judicata* and remand her case to the Secretary, so that he can pay her claim.  It should not entertain "repetitious litigation involving . . . the same issue[]" already resolved between these parties.  *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946 (D.C. Cir. 1983).

     "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008); *accord NextWave Pers. Commc'ns Inc. v. FCC*, 254 F.3d 130, 142 (D.C. Cir. 2001) (quoting *I.A.M.*, 723 F.2d at 946).  "The objective of the doctrine of issue preclusion (also known as collateral estoppel) is judicial finality; it 'fulfills the purpose for which civil courts had been established, the conclusive resolution of disputes within their jurisdiction.'" *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 467 n.6 (1982)); *accord Montana v. United States*, 440 U.S. 147, 153 (1979); *Consol. Edison Co. v. Bodman*, 449 F.3d 1254, 1258 (D.C. Cir. 2006) (quoting *Yamaha*).

     "Issue preclusion . . . bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment. . . .'" *Taylor*, 553 U.S. at 892 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)); *accord Yamaha*, 961 F.2d at 254 ("The Supreme Court has defined issue preclusion to mean that 'once a court has decided an issue of fact or law necessary to its judgment, that decision'" usually "'preclude[s] relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)); *Cotton v. Heyman*, 63 F.3d 1115, 1119 (D.C. Cir. 1995) ("Generally, issue preclusion bars the relitigation of specific issues decided in a prior proceeding between the same parties."); *McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C. Cir. 1986) (quoting *Allen*). As the Second Restatement puts it, "When an

- 8 -

issue of fact or law is actually litigated and determined by a valid and final judgment, and the
determination is essential to the judgment, the determination is conclusive in a subsequent action
between the parties, whether on the same or a different claim." Restatement (Second) of
Judgments § 27 (1982); *accord Amador County, Cal. v. Salazar*, 640 F.3d 373, 384 (D.C. Cir.
2011); *Consol. Edison*, 449 F.3d at 1258; *Fogg v. Ashcroft*, 254 F.3d 103, 111 (D.C. Cir. 2001)
(all quoting Second Restatement).

     Under the D.C. Circuit's three-part test "for establishing the preclusive effect of a prior
holding," *Yamaha*, 961 F.2d at 254, Ms. Lewis's previous judgment clearly entitles her to prevail
here. "First, the same issue now being raised"—the question of whether continuous glucose
monitors are durable medical equipment under the Medicare statute and regulations—was
"contested by the parties and submitted for judicial determination in the prior case." *Id.*; *see
Lewis*, 308 F. Supp. 3d at 576 (exercising "judicial review" over the Secretary's finding that a
"CGM was not covered under the Durable Medical Equipment ('DME') Medicare benefit").
"Second, the issue must have been actually and necessarily determined by a court of competent
jurisdiction in the prior case." *Yamaha*, 961 F.2d at 254. It was. *Lewis*, 308 F. Supp. 3d at 579
(holding that the Secretary's interpretation "constituted legal error"). "Third, preclusion in the
second case must not work a basic unfairness to the party bound by the first determination."
*Yamaha*, 961 F.2d at 254 ("An example of such unfairness would be when the losing party
lacked any incentive to litigate the point in the first [case], but the stakes of the second [case] are
of a vastly greater magnitude.") The Secretary lost the first case, and does not suggest that entry
of judgment for Ms. Lewis on the grounds of issue preclusion would be unfair in any way.

The issue in this case is plainly *res judicata* between Ms. Lewis and the Secretary. The only question is whether Ms. Lewis can avoid the preclusive effect of her first judgment by refusing to raise it here. This Court need not—and should not—permit her to do so.

"It is a sound and important policy in the administration of justice that what has already been done and determined not be redone and redetermined unnecessarily." *Texaco, Inc. v. Hickel*, 437 F.2d 636, 646 (D.C. Cir. 1970). "[W]hile res judicata exists in part to shield parties from duplicative and vexatious litigation, the interests that courts protect are also often their own—or, more precisely, those of society." *Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 77 (D.C. Cir. 1997); *Allen*, 449 U.S. at 94 ("As this Court and other courts have often recognized, . . . collateral estoppel relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication."); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979) ("Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party . . . and of promoting judicial economy by preventing needless litigation."); *see Taylor*, 553 U.S. at 892; *Montana*, 440 U.S. at 153–54. "Courts today are having difficulty giving a litigant one day in court. To allow that litigant a second day is a luxury that cannot be afforded." *Stanton*, 127 F.3d at 77 (quoting *National Treasury Employees Union v. IRS*, 765 F.2d 1174, 1177 (D.C. Cir. 1985)); *see also Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) (explaining that "today's crowded dockets" make principles of preclusion "even more compelling").

"As res judicata belongs to courts as well as to litigants, even a *party's* forfeiture of the right to assert it . . . does not destroy a *court's* ability to consider the issue sua sponte." *Stanton*, 127 F.3d at 77 (emphases in original). As the D.C. Circuit has explained, a "district court may

- 10 -

apply res judicata upon taking judicial notice of [the] parties' previous case." *Tinsley v. Equifax Credit Info. Servs.*, 1999 WL 506720, at *1 (D.C. Cir. June 2, 1999) (per curiam) (describing the holding of *Gullo v. Veterans Coop. Housing Ass'n*, 269 F.2d 517 (D.C. Cir. 1959) (per curiam)); *see Amore v. Accore, S.A.*, 484 F. Supp. 2d 124, 129 (D.D.C. 2007); *Burlington Res. Oil & Gas Co. v. U.S. Dep't of the Interior*, 21 F. Supp. 2d 1, 4 n.4 (D.D.C. 1998) (both considering issue preclusion *sua sponte* because the doctrine "belongs to courts as well as to litigants," *Stanton*, 127 F.3d at 77).

The Court should do so here.  There is no reason to allow Ms. Lewis to manufacture a second federal case on an issue that she has already won in litigation against the Secretary. When Ms. Lewis received her first judgment, the claim for which she seeks review here was pending before the Medicare Appeals Council.  She could simply have asked the Council to recognize the judgment in her favor; if it did not do so, she could have raised a simple plea of *res judicata* in district court.  Instead she did neither, accelerating this case to federal court and then attempting to evade the effect of the earlier judgment.  The only possible explanation for this stratagem is that Ms. Lewis wishes to serve as a class representative.  For the reasons explained below, class certification would be inappropriate even if Ms. Lewis is allowed to litigate her case on the merits once again.  But her desire to represent a class does not provide independent grounds for her repetitious claim.  Indeed, that argument gets the relationship between individual claims and class claims precisely backwards: a plaintiff can serve as class representative only where she has a "personal stake in the outcome of the lawsuit." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (quotations omitted).  Ms. Lewis no longer has anything at stake in the Court's resolution of the merits of this case.

"Preclusion doctrine provides ample means to dispose of repetitive suits like this one."

*McLaughlin*, 803 F.2d at 1201.  As the Supreme Court has long held, "matters which were

actually litigated and determined in the first proceeding" between two parties "cannot later be

relitigated."  *Sunnen*, 333 U.S. at 598.  And "[t]here is . . . an important judicial concern at stake"

in the application of issue preclusion here.  *National Treasury Employees Union*, 765 F.2d at

1177.  Ms. Lewis has litigated this issue once already, and she has prevailed.  She is therefore

entitled to payment of her claim for benefits.  But Ms. Lewis has no right to needlessly consume

the resources of the federal courts—and the Secretary, as well—by demanding a second

determination on the merits.

Rather than entertaining repetitious litigation, this Court should take judicial notice of her

earlier case, enter judgment on *res judicata* grounds, and remand her claim to the Secretary for

payment of benefits.

### B. This Court lacks subject matter jurisdiction over Douglas Sargent's claims, which should be dismissed.

As the Secretary has explained in his pending motion to dismiss, Mr. Sargent's claims

both fall short of the Medicare Act's minimum amount in controversy for judicial review, and

this Court therefore lacks jurisdiction over them.  For the convenience of the Court, and because

these arguments are also relevant to certain issues regarding class certification, the Secretary

briefly restates them here.

After exhausting administrative remedies, a Medicare beneficiary is "entitled . . . to

judicial review of the Secretary's final decision," but "judicial review shall not be available to

the individual if the amount in controversy is less than" an inflation-indexed sum, which stood at

$1,600 when this suit was filed.  42 U.S.C. § 1395ff(b)(1)(A), (E)(i), (iii); *see* 83 Fed. Reg. at

47,620.  Mr. Sargent seeks judicial review of two final decisions of the Secretary, each of which

Plaintiffs have failed to affirmatively demonstrate the superiority of class litigation, as required by Rule 23(b)(3)—and that failure is especially acute as to the potential class members who participate in the Medicare Advantage program.[15]

## CONCLUSION

This Court should 1) dismiss Mr. Sargent's claims for lack of subject matter jurisdiction, 2) take judicial notice of the preclusive effect of Ms. Lewis's earlier judgment and enter judgment in her favor on the grounds of *res judicata*, and 3) deny the motion for class certification as moot. If the Court proceeds to the merits of the class certification motion, it should deny that motion for the reasons set forth above, chief among them plaintiffs' failure to establish numerosity as required by Rule 23(a)(1).

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MICHELLE BENNETT
Assistant Director, Federal Programs Branch

*/s/ James Bickford*
JAMES BICKFORD
Trial Attorney (N.Y. Bar No. 5163498)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530

---

[15] In accordance with Local Civil Rule 23(c), the Secretary respectfully suggests that the Court should "postpone a determination of the matter" of "how, when, by whom, and to whom the notice required by Fed. R. Civ. P. 23(c)(2) shall be given" until after the motion for class certification is decided, as the appropriate method of notice is likely to depend on the size of any class that may be certified. In addition, if the Court grants class certification, the Secretary suggests that it do so in general terms, and allow the parties to address the technical details of the class composition (which billing codes indicate class membership, for example) in any post-certification briefing.

James.Bickford@usdoj.gov
Telephone: (202) 305-7632
Facsimile: (202) 616-8470

Date: April 21, 2020                    *Counsel for Defendant*

# EXHIBIT K

A

# TREATISE

ON THE

# LAW OF ESTOPPEL

OR OF

## INCONTESTABLE RIGHTS

BY

MELVILLE M. BIGELOW

SIXTH EDITION, REVISED

BY JAMES N. CARTER, PH. B., J. M.

BOSTON
LITTLE, BROWN, AND COMPANY
1913


Digitized by Google

Entered according to Act of Congress, in the year 1872,
By MELVILLE M. BIGELOW,
In the Office of the Library of Congress, at Washington.

———

*Copyright, 1888, 1890, 1900, 1913,*
By MELVILLE M. BIGELOW.

Digitized by Google

ties when coming incidentally in question in another court for a
different purpose.  Having stated that the Spiritual Court had
exclusive jurisdiction of questions of marriage, though the tem-
poral courts entertained such questions incidentally, and that
the latter courts were bound by the adjudications of the former
courts between the same parties, he then said that the case was
different when the judgments of the Spiritual Court were in-
volved in *criminal* cases; for then the parties were in all cases
different.  The king, he said, in whom the trust of prosecuting
public offences was vested, was no party to proceedings in the
Ecclesiastical Court, and could not be admitted to defend, ex-
amine witnesses, intervene in any way, or appeal.  He then
proceeded to say that whatever might be the doctrine in regard
to the conclusiveness of a positive adjudication concerning mar-
riage when involved in a criminal case, a cause of jactitation
was different.[1]

Outram *v.* Morewood [2] is a leading case of high authority
upon this subject.[3]  The case was this: An action of trespass

[1] ' This,' he said, ' is ranked as a
cause of defamation only, and not
as a matrimonial cause, unless
where the defendant pleads a mar-
riage; and whether it continues a
matrimonial cause throughout, as
some say, or ceases to be so on
failure of proving a marriage, as
others have said, still the sentence
has only a negative and qualified
effect; viz. that the party has
failed in his proof, and that the
libellant is free from all matrimo-
nial contract, as far as yet appears;
leaving it open to new proofs of the
same marriage in the same cause,
or to any proofs of that or any
other marriage in another cause;
and if such sentence is no plea to
a new suit there . . . it cannot
conclude a court which receives
the sentence from going into new
proofs to make out that or any
other marriage. So that, admitting
the sentence in its full extent and
import, it only proves that it did not
yet appear that they were married,
and not that they were not married
at all; and by the rule laid down by
Holt, L. C. J. such sentence can
be no proof of anything to be in-
ferred by argument from it; and
therefore it is not to be inferred
that there was no marriage at any
time or place because the court
had not then sufficient evidence
to prove a marriage at a particular
time and place.  That sentence
and this judgment may stand well
together, and both propositions be
equally true; it may be true that
the Spiritual Court had not then
sufficient proof of the marriage
specified, and that your lordships
may now, unfortunately, find suffi-
cient proof of some marriage.'  See
Hughes *v.* Jones, 116 N. Y. 67, 22
N. E. 446, 15 A. S. R. 386.

[2] 3 East, 346.  See Loan Asso-
ciation *v.* Black, 119 N. C. 323,
25 S. E. 975.

[3] See among many other cases
so treating Outram *v.* Morewood,
Pittapur *v.* Garu, L. R. 12 Ind.

Digitized by Google

was brought for digging and getting out coals from a mine
alleged by the plaintiff to be within and under his close, called
Cowclose.  The defendants pleaded and showed title by a reg-
ular chain in right of the wife from Sir John Zouch; and they
averred that the coals in question were under the lands of Zouch,
and were derived by bargain and sale to certain immediate
bargainees, from them to the defendant, the wife, and were not
within a certain exception named.  To this plea the plaintiff
replied, and relied by way of estoppel upon a former verdict
obtained by him in an action of trespass brought by him against
one of the defendants, the wife of the other defendant (she being
then sole), in which he declared for the same trespass as now;
to which the wife pleaded and derived title in the same manner
as now by her and her husband, and in which she alleged that
the coal mines in question in the declaration mentioned were at
the time of making the above-mentioned bargain and sale by
Zouch part and parcel of the coal mines by that indenture bar-
gained and sold.  And that upon this point, whether the coal
mines claimed by the plaintiff and mentioned in his declaration
were parcel of what passed under Zouch's bargain and sale to
the persons under whom the wife claimed, an issue was taken
and found for the plaintiff, and against the wife.  The question
was, in the language of Lord Ellenborough, ' whether the defend-
ants, the husband and wife, were estopped by this verdict and
judgment thereupon from now averring (contrary to the title so
then found against the wife) that the coal mines now in ques-
tion are parcel of the coal mines bargained and sold by the in-
denture above mentioned.'  And it was held that they were.[1]

App. 16; De Mora v. Concha, 29
Ch. D. 268, C. A. (affirmed on ap-
peal nom.  Concha v. Concha, 11
App. Cas. 541).

[1] In delivering the judgment of
the court, Lord Ellenborough, C. J.
said: ' The operation and effect of
this finding, if it operate at all as
a conclusive bar, must be by way
of estoppel.  If the wife were bound
by this finding as an estoppel, and
precluded from averring the con-
trary of what has been so found,
the husband in respect of his

privity, either in estate or in law,
would be equally bound.  Coke,
Litt. 352 a.  [See Lindsey v. Dan-
ville, 46 Vt. 144, 148.] . . . The
question then is, Is the wife herself
estopped by this former finding?
In Brooke, tit. Estoppel, pl. 15;
ibid. Estate, 158, it is said to be
" agreed that all the records in
which the freehold comes in debate
shall be estopped with the land,
and run with the land; so that a
man may plead this as a party, or
as heir, as privy, or by que estate."

Digitized by Google

# EXHIBIT L

Department of Health and Human Services

DEPARTMENTAL APPEALS BOARD

Civil Remedies Division

*In re* LCD Complaint:
Tumor Treatment Field Therapy
LCD ID Number: L34823
Contractor: CGS Administrators, LLC

Docket No. C-19-396

Date: May 28, 2019

ORDER REGARDING DISCOVERY AND
ADDITIONAL EVIDENCE

Om May 20, 2019, CGS Administrators, LLC (CGS) filed its "Contractor's Response to the Aggrieved Party's Statement Regarding the LCD Record, Motion to Strike the LCD as Invalid, and Motion to Supplement Complaint (CGS response). Under the regulations, the next step is for me to evaluate the evidence that has been submitted and determine if "the LCD record is complete and adequate to support the validity of the LCD" under the reasonableness standard. 42 C.F.R. § 426.425(c)(1). For the reasons stated below, I conclude that the record presently is insufficient to support the validity of the challenged provision in LCD L34823. As a result, I order the parties to indicate whether they want me to close the record in this case or whether they want to engage in discovery or otherwise provide me with additional evidence. 42 C.F.R. § 426.425(c)(3).

**I. The LCD's record does not support the LCD's validity.**

After I accepted the Aggrieved Party's Complaint in this matter, in conformance with the regulations governing this case, I ordered CGS to file the LCD record, the Aggrieved Party to file a statement explaining why the LCD is not valid, and CGS to file a response defending the LCD. *See* 42 C.F.R. §§ 426.410(d)(3), 426.425(a)-(b). The parties have completed their submissions. I have reviewed the submissions and conclude that the LCD record is insufficient to support the LCD's categorical denial of coverage for tumor treatment field therapy (E0766) (TTFT).

2

### A. The Aggrieved Party has standing to challenge the LCD.

CGS indicated that the Aggrieved Party's "LCD complaint is inapplicable as binding to the [Medicare Advantage] Plan" because Medicare Advantage Plans "have the option of providing individualized care if desired . . . and thus, are not bound to cover only Medicare-covered services." CGS Response at 1. Although not entirely clear, CGS appears to be challenging the Aggrieved Party's standing to challenge the LCD.

If this is the case, CGS is mistaken in its argument because an "Aggrieved party" includes enrollees in Medicare managed care plans so long as coverage for a service was denied based on the challenged LCD. 42 C.F.R. § 426.110. The Aggrieved Party meets these requirements. A. Ex. 8 at 5-6. Therefore, the Aggrieved Party has standing to challenge the LCD. 42 C.F.R. § 426.320(a).

### B. An Aggrieved Party may challenge an LCD because it is outdated.

CGS asserted that the LCD record shows that the LCD was valid at the time the LCD was adopted. CGS further indicated that there is a reconsideration process for revising LCDs in the Medicare Program Integrity Manual, Chapter 13. CGS then concluded that "[n]either the relevant Statutes, Federal rules and regulations, nor sub-regulatory guidance issued by [the Centers for Medicare & Medicaid Services (CMS)] contemplated the role of an LCD Challenge as an alternate pathway for an LCD Reconsideration." CGS Response at 3-4, 7.

CGS misunderstands both the LCD challenge process and how it relates to the LCD reconsideration process. Congress established LCDs and provided some basic requirements related to the development of LCDs. 42 U.S.C. § 1862(*l*)(5). However, Congress also established an LCD review process, to be conducted by an administrative law judge (ALJ). 42 U.S.C. § 1395ff(f)(2). This process is meant to determine the validity of the LCD. *Id.* § 1395ff(f)(2)(i)(I). In promulgating the regulations to implement this process to challenge an LCD, the Secretary of Health and Human Services (Secretary) made it clear that the process for challenging the validity of an LCD may be invoked because "a challenger may believe that a policy that was correct when it was issued has become outdated and is no longer valid in light of advances in medicine." 68 Fed. Reg. 63,692, 63,700 (Nov. 7, 2003). In fact, the Secretary expressly permitted aggrieved parties to submit new evidence concerning the LCD so that the ongoing validity of the LCD could be tested. *Id.*; *see also* 42 C.F.R. § 426.403.

Further, the Secretary was fully aware of the LCD reconsideration process and provided procedures by which the contractor or the ALJ could evaluate whether new evidence submitted in the case warranted a reconsideration of the LCD. 42 C.F.R. §§ 426.340, 426.417. As stated in the preamble to the final rule:

We have modified the procedures at § 426.340 to allow the
ALJ/Board to make a preliminary determination on whether
the new evidence submitted would have a significant bearing
on the validity of the LCD/NCD.  If the evidence is found
significant, it would be sent to the contractor/CMS to
determine whether the contractor/CMS agrees that the
evidence warrants a formal reconsideration.  As mentioned
earlier, the reconsideration process would be time limited but
would allow the public to submit medical and scientific
evidence and allow the agency to fully develop the record in
light of advances in medical science.  Following the time-
limited reconsideration, a supplemental record would be filed
and the adjudication could continue, if necessary.

This approach will provide the contractor/CMS the initial
opportunity to permit medical and scientific experts to
examine the new evidence and to make findings of fact
concerning the new evidence.  Among other things, the
statute requires that the ALJ/Board "shall defer only to the
reasonable findings of fact" and it was impossible for the
agency to have made findings on evidence that did not yet
exist or that had not been furnished to the agency for
consideration.  We believe this approach is necessary to
ensure that the medical and scientific opinions of the agency
experts illuminate the record, since these appeals could
involve very technical medical and scientific material related
to the new evidence.

68 Fed. Reg. at 63,700.  The Secretary knew that the LCD review process and
reconsideration processes are different.  The preamble to the final rule stated:

**5. Differences Between an LCD/NCD Review and an
LCD/NCD Reconsideration**

The main difference between an LCD/NCD review under
section 522 of the BIPA and an LCD/NCD reconsideration is
the avenue an individual chooses to take to initiate a change
to a coverage policy and who may initiate the review. All
interested parties, including an aggrieved party, may request a
reconsideration of an LCD or NCD, rather than filing a
complaint to initiate the review of an LCD or NCD.
Conversely, only an aggrieved party may file a complaint to
initiate the review of an LCD or NCD.  If the aggrieved party

4

> believes that we, or the contractor, misinterpreted evidence or
> excluded available evidence in making the coverage
> determination or has new evidence to submit, then the
> aggrieved party has the option to file a request for a
> reconsideration by the contractor or us, respectively, or to file
> a complaint to seek review by an adjudicator.
>
> In the reconsideration process, all interested parties, not just
> aggrieved parties, have the opportunity to submit new
> scientific and medical evidence for review by individuals
> with medical and scientific expertise. The reconsideration
> process permits experts to make judgments about those
> policies, rather than using an adjudicatory proceeding.

68 Fed. Reg. at 63,694. Another major distinction between the LCD review process
before an ALJ and the reconsideration process before a contractor is that an ALJ can only
decide that an LCD provision is no longer valid, but cannot revise the LCD provision.
42 C.F.R. §§ 426.405(d)(14), 426.450(a)(2).

### C. The LCD's record is inadequate to support the validity of the LCD.

CGS filed the record of the LCD in this case. The LCD was published in 2015, and the
entire LCD record consists of documentation and reports from that time and earlier.
However, the Aggrieved Party has submitted many documents and reports that more
recently show the efficacy of TTFT, at least within certain parameters. Significantly, the
Aggrieved Party has submitted 21 out of the 29 reports and journal articles that CGS has
considered in the reconsideration process that CGS has already started. A. Exs. 5-6, 12,
70-72, 82, 95, 122-123, 125, 129, 136-137, 139, 143, 146, 150, 155, 157, 158; CMS Ex.
43 at 10-13. Further, based on these documents, CGS, along with other Medicare
contractors, have proposed to remove the categorical prohibition on coverage of TTFT to
permit coverage if specific criteria are met. CMS Ex. 44.

### II. The parties may request to engage in discovery and submit additional evidence.

The regulations state:

> If the ALJ determines that the LCD record is not complete
> and adequate to support the validity of the LCD, the ALJ
> permits discovery and the taking of evidence in accordance
> with §§426.432 and 426.440 and evaluates the LCD in
> accordance with §426.431.

42 C.F.R. § 426.425(c)(3).

5

In the present case, the Aggrieved Party appears likely to have submitted all of the evidence it plans to submit and CGS has already indicated that it neither plans to submit written direct testimony for any witnesses nor cross-examine the Aggrieved Party's witnesses.  However, the parties will indicate by **June 5, 2019**, if they want to pursue discovery or to submit additional evidence.

Further, if the parties have objections to any of the exhibits submitted thus far by the other party, written objections must be submitted by **June 5, 2019**.

When the evidentiary record closes in this case, I will next need to determine whether the new evidence in the record is significant and permit CGS an opportunity to conduct a reconsideration.  42 C.F.R. § 426.340.


Scott Anderson
Administrative Law Judge


Addressees:

Debra M. Parrish, Esq.
788 Washington Road
Pittsburgh, PA  15228
bridget@dparrishlaw.com
*Served by DAB E-File*

Stacey V. Brennan, M.D.
Chief Medical Officer, Jurisdiction B DME MAC
Ashley Barnett, R.N.
Medical Affairs Coordinator
CGS Administrators, LLC
Two Vantage Way
Nashville, TN  37228
stacey.brennan@cgsadmin.com
ashley.barnett@cgsadmin.com
*Served by DAB E-File*

# EXHIBIT M



# Financial
# Report

Fiscal Year **2018**

Original Publication Date:
November 15, 2018

Publication Number:
909537

Inventory Control
Number:
909537

# AT A GLANCE

The Centers for Medicare & Medicaid Services (CMS) is an operating division within the Department of Health and Human Services (HHS). The CMS Annual Financial Report for FY 2018 presents the agency's detailed financial information relative to our mission and the stewardship of those resources entrusted to us. This report is organized into the following three sections:



## MANAGEMENT'S DISCUSSION & ANALYSIS

This section gives an overview of our organization, programs, performance goals, and overview of financial data.



## FINANCIAL SECTION

This section contains the message from our Chief Financial Officer, financial statements and notes, required supplementary information, and audit reports.



## OTHER INFORMATION

This section includes the Summary of the Federal Managers' Financial Integrity Act Report and the Office of Management and Budget (OMB) Circular A-123— Management Responsibility for Enterprise Risk Management and Internal Control.

## 2018 FEDERAL OUTLAYS

CMS has outlays of approximately $995 billion (net of offsetting receipts and Payments of the Health Care Trust Funds) in fiscal year (FY) 2018, approximately 16 percent of total Federal outlays.

CMS employs approximately 6,200 Federal employees, but does most of its work through third parties. CMS and its contractors process over one billion Medicare claims annually, monitor quality of care, provide the states with matching funds for Medicaid benefits, and develop policies and procedures designed to give the best possible service to beneficiaries. CMS also assures the safety and quality of medical facilities, provides health insurance protection to workers changing jobs, and maintains the largest collection of health care data in the United States (U.S.).

## 2018 PROGRAM ENROLLMENT

CMS is one of the largest purchasers of health care in the world. Medicare, Medicaid, and Children's Health Insurance Program (CHIP) provide health care for one in four Americans. Medicare enrollment has increased from 19 million beneficiaries in 1966 to approximately 59 million beneficiaries. Medicaid enrollment has increased from 11 million beneficiaries in 1966 to about 73 million beneficiaries.



Treasury **$629**
Social Security **$1,040**
Defense **$601**
Other **$843**
CMS **$995**

$ in billions                    Source: U.S. Treasury



in millions

| 1966 | 1975 | 1985 | 1995 | 2005 | 2018 |

Medicare: 19, 28, 31, 33, 42, 56, 59, 73
Medicaid: 11, 22, 23, 27, 43, 70

■ Medicare  ■ Medicaid

**CMS FINANCIAL REPORT 2018   I**